UNITED STATES BANKRUPTCY COURT      **FOR PUBLICATION**
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
In re:                      :
                           :
     GENERAL MEDIA, INC.,    :      Chapter 11 (Confirmed)
                           :      Case No. 03-15078(SMB)
          Debtor.     :
------------------------------X
PENTHOUSE MEDIA GROUP, as    :
successor-in-interest to     :
GENERAL MEDIA, INC. and      :
GENERAL MEDIA COMMUNICATIONS, :
Reorganized Debtors,        :
                           :
         Plaintiff,    :      Adv. Proc. No. 05-2414
                           :
     – against –          :
                           :
ROBERT C. GUCCIONE,       :
                           :
         Defendant.    :
------------------------------X

### OPINION AND ORDER GRANTING
### MOTION TO DISMISS COMPLAINT


**A P P E A R A N C E S:**

BERKMAN, HENOCH, PETERSON & PEDDY, P.C.
Attorneys for Plaintiff
100 Garden City Plaza
Garden City, New York 11530

     Ronald M. Terenzi, Esq.
     Bruce D. Mael, Esq.
        Of Counsel


PRYOR CASHMAN SHERMAN & FLYNN LLP
Attorneys for Defendant
410 Park Avenue
New York, New York 10022

     Jamie M. Brickell, Esq.
     Richard Levy, Jr., Esq.
     Ronald Giller, Esq.
        Of Counsel

**STUART M. BERNSTEIN**
**Chief United States Bankruptcy Judge**

The plaintiff filed this adversary proceeding against the reorganized debtors' former Chairman, Chief Executive Officer and director, Robert C. Guccione, to recover money damages and other relief.  Guccione moved to dismiss, contending, <u>inter alia</u>, that the claims fell outside of the Court's limited post-confirmation subject matter jurisdiction.  For the reasons that follow, the motion is granted.

**BACKGROUND**

The plaintiff is the successor-in-interest to General Media, Inc. and General Media Communications, Inc. (collectively, "General Media").  (¶ 2.)[1]  General Media filed a chapter 11 petition on August 12, 2003, (¶ 6), and confirmed the Fourth Amended Plan of Reorganization (the "Plan") on August 13, 2004.[2]  (¶ 7.)  PET Capital Partners ("PET") acquired General Media under the Plan, and now owns a majority interest in and manages the plaintiff.  (¶ 36.)  At all relevant times prior to the

---

[1]    Unless otherwise stated, the parenthetical references in this "Background" section are to the paragraphs in the <u>Complaint for Turnover of Property of Debtors and Related Relief</u>, dated Aug. 30, 2005 (the "Complaint") (ECF Doc. # 1).

[2]    The Plan is attached as Exhibit B to the <u>Declaration of Jamie M. Brickell</u>, dated Nov. 2, 2005 (ECF Doc. # 7).

confirmation date, Guccione served as a director, Chairman and
Chief Executive Officer of General Media.  (¶ 11.)  His
employment with General Media ended on October 5, 2004, the
effective date of the Plan.  (¶¶ 12, 19.)

**B.    The Specific Property Sought By The Plaintiff**

   **1.    Townhouse Property**

   At all relevant times, Guccione has resided at 14-16 East
67th Street, New York, New York (the "Townhouse").  (¶ 13.)  He
also used the Townhouse as an office and studio for General
Media's business.  (¶ 14.)  Numerous pieces of artwork, furniture
and decorations located at the Townhouse (the "Townhouse
Property") were owned by General Media and are presently owned by
the plaintiff.  (See ¶ 15.)

   In late 2003, the Townhouse Owner (the "Owner") sought
relief from the automatic stay to evict General Media and
Guccione.  General Media and the Owner disputed each other's
rights in some of the Townhouse Property, and in particular,
whether certain items were fixtures or personal property under
applicable non-bankruptcy law.  General Media and the Owner
entered into a stipulation, "so ordered" on January 15, 2004 (the
"January 15 Stipulation")(ECF Doc. # 223, in Chapter 11 Case No.
03-15078 (SMB)), which provided for an interim resolution of the

ownership question.[3]

The January 15 Stipulation divided the Townhouse Property into two categories. "Unresolved Property," which consisted of ten items and was in dispute, would not be removed from the Townhouse or disturbed absent further order of the Court or the agreement of the parties. The remainder, "Removable Personal Property," had to be removed by General Media no later than 12:01 a.m. on February 7, 2004. If it was not removed by the deadline, it became "Abandoned Property." The Owner could then remove and dispose of the "Abandoned Property" without prejudice to the rights, if any, of General Media's secured creditors in the "Abandoned Property." The January 15 Stipulation also provided that it could not be modified or affected by any plan or confirmation order. Pursuant to an order dated February 13, 2004, the Court extended the February 7th deadline to February 17th.[4]

Upon information and belief, Guccione subsequently entered

---

[3]       The January 15 Stipulation is referred to in paragraph 16 of the Complaint. A copy is attached as part of Exhibit B to the <u>Plaintiff's Objection to Defendant's Motion to Dismiss Complaint</u>, dated Nov. 28, 2005 ("<u>Plaintiff's Objection</u>") (ECF Doc. # 9).

[4]       The order extending the deadline is also referred to in paragraph 16 of the Complaint, and attached as part of Exhibit B to the <u>Plaintiff's Objection</u>. The Court is unable to locate the order on the docket, but there appears to be no dispute regarding its validity.

into an agreement with the Owner which permitted him to continue to reside at the Townhouse. (¶¶ 17-18.) Upon information and belief, the Townhouse Property is still located at the Townhouse, but Guccione has refused to turn the property over to the plaintiff despite due demand. (¶¶ 20-21.)

### 2. The Trademark Property

Upon information and belief, certain trademarks in the United Kingdom (the "UK Trademarks") are owned by Penthouse Publications Limited ("PPL"), a British company wholly owned by Guccione.[5] (¶ 22.) By letter agreements dated July 9, 2004 and July 12, 2004 between Guccione and Charles Samel (the "Trademark Agreements"), Guccione agreed to cause PPL to sell the UK Trademarks to Samel. Alternatively, he agreed to sell all of the shares of PPL stock to Samel.[6] In either case, the purchase price was $250,000, payable in $50,000 increments per year for five years, provided that General Media's Second Amended Plan of Reorganization was not confirmed, which it was not. (¶¶ 23, 26.) Samel made an initial payment of $50,000 to Guccione, leaving a balance of $200,000. (¶ 25.)

---

[5] The UK Trademarks include the names "PENTHOUSE UK," "PENTHOUSE VARIATIONS" and "PETS," and the "ONE KEY" logo and the "THREE KEY" logo. (¶ 22.)

[6] The UK Trademarks and the PPL stock are referred to collectively, as the "Trademark Property."

5

By agreement dated August 10, 2005, Samel assigned his
rights under the Trademark Agreements to the plaintiff. (¶ 27.)
Approximately five days later, the plaintiff wired $200,000 to
Guccione's counsel, and asked for the transfer of the PPL stock
in accordance with the Trademark Agreements. (¶ 28.) Guccione
refused to transfer either the UK Trademarks or the PPL stock to
the plaintiff despite due demand. (¶ 29.)

### 3.   The Domain Name

Upon information and belief, General Media used the domain
name "penthouse.com.au" (the "Domain Name") as of the filing date
in connection with its business operations in Australia. (¶ 30.)
Upon information and belief, the Domain Name was created solely
for General Media's use, and is owned by Penthouse Australia Pty,
Ltd., an Australian company wholly-owned by General Media
International, Inc.("GMII"), which, in turn, is a non-debtor
entity wholly-owned by Guccione. (¶¶ 30-32.) During the
bankruptcy case, Guccione breached his duty to disclose the
existence of the Domain Name, the identity of the true owner, and
the conditions under which General Media was allowed to use it.
(¶¶ 33-34.) Furthermore, Guccione knowingly continued to conceal
the existence of the Domain Name after his employment was
terminated. (¶ 37.)

6

Upon information and belief, General Media paid all of the
service, maintenance and other charges in connection with the
Domain Name prior to the confirmation date.  (¶ 35.)  The
plaintiff learned about the existence of the Domain Name some
time after the effective date of the Plan, and since then, has
paid the charges for the use, maintenance and other charges in
connection with the Domain Name.  (¶¶ 38-39.)  The plaintiff
cannot operate its business without the ability to use the Domain
Name, and this severely hampers its ability to fulfill its
obligations under the Plan.  (¶ 40.)  Guccione has refused to
surrender the Domain Name to the plaintiff despite due demand.
(¶ 82.)


**C.    The NTS Offsets**

On or about October 3, 1997, General Media entered into
certain Service Agreements with Network Telephone Services, Inc.
("NTS") pursuant to which NTS provided various telephone-related
services.  (¶ 41.)  Each Service Agreement provided that if
General Media failed to make a payment, NTS could offset any
money that it owed General Media under any other agreements
between the parties.  (¶ 42.)  NTS was not authorized to offset
any other obligations against the amounts due to General Media.
(¶ 43.)

7

At about the same time, Guccione personally borrowed $1,212,000 from NTS.  The loan was evidenced by a promissory note (the "Note"), and Guccione's debt was guaranteed by GMII.  (¶¶ 44-45.)  In addition, Guccione and GMII guaranteed General Media's obligations under the Service Agreements.  (¶ 46.)

Also at the same time, General Media delivered a letter to NTS explaining that it could not grant security interests to NTS or guaranty Guccione's obligations under the Note because of restrictive covenants in an indenture between General Media and IBJ Schroder Bank & Trust Co.  (¶ 47.)  Notwithstanding the restrictive covenant, Guccione, GMII and NTS entered into a Side Agreement which provided that if the Note remained unpaid on January 1, 2001, NTS could offset the funds due and owing to General Media under the Service Agreements against the amount due under the Note.  (¶¶ 48-49.)  General Media was not a party to the Side Agreement, and never consented to be bound by it.  (¶ 50.)

The Note went into default, and NTS sued the defendant, GMII and General Media in December 2001.  (¶ 52.)  The parties entered into a Settlement Agreement in November 2002, which confirmed NTS's right of offset against amounts due under the Note.  (¶¶ 53-54.)  Guccione made General Media a party to the Settlement

Agreement, even though he knew that NTS had no right of offset against General Media, and even though the offset was not permitted under the indenture.  (¶¶ 55-56.)

Between December 2000 and August 2003, Guccione allowed NTS to offset $1,659,996.65 owed to General Media against the unpaid balance of the Note and the GMII guarantee.  (¶ 57.)  After General Media filed its petition on August 12, 2003, Guccione continued to allow the unauthorized offsets, and NTS offset an additional $666,040.26.  (¶¶ 60-63.)  General Media did not receive any consideration on account of the offsets.  (¶ 59.) The plaintiff (or General Media) has recovered only $550,000 from NTS on account of the offsets.  (¶ 64.)

**D.    This Litigation**

The plaintiff filed its five count Complaint against Guccione on or about August 30, 2005.  The first three causes of action seek the turnover under 11 U.S.C. § 542(a), respectively, of the Townhouse Property (¶¶ 65-69), Trademark Property (¶¶ 70-75) and the Domain Name (¶¶ 76-83).  The Fourth and Fifth Causes of Action are based on the NTS offsets, and assert damage claims sounding, respectively, in conversion (¶¶ 84-89) and breach of fiduciary duty (¶¶ 90-94).

Guccione moved to dismiss the Complaint under FED. R. CIV. P.
12(b)(1) for lack of subject matter jurisdiction and FED. R. CIV.
P. 12(b)(6) for failure to state a claim on which relief can be
granted.  Guccione argues, in the main, that the Court lacks
subject matter jurisdiction.  In addition, he contends that a
turnover action will not lie post-confirmation because there is
no trustee and no estate.  Next, he maintains that the Plan
released him from liability based on pre-petition conduct other
than conduct that was fraudulent, willful or grossly negligent.
Finally, he asserts that the plaintiff should be estopped from
asserting the claims because they were not raised during the
bankruptcy case or disclosed to the creditors, and the plaintiff
procured Guccione's support for confirmation without disclosing
its intention to bring this action.

The plaintiff counters that (1) the Court retained
jurisdiction over these claims in the Plan, (2) the plaintiff
acquired the right to pursue these claims as consideration for
PET's funding of the Plan, and (3) the turnover claims were
preserved under the Plan.  Furthermore, the Townhouse Property
was the subject of a prior Court order, which the First Cause of
Action seeks to enforce.  Lastly, some of the damage claims are
clearly within the statute of limitations, and the release
defense, which excludes intentional wrongs, cannot be decided on

10

a motion to dismiss.


**DISCUSSION**

**A.   Standards Governing the Motion**

Guccione seeks relief under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  A court may dismiss a complaint under FED. R. CIV. P. 12(b)(6) only if it appears beyond doubt that the plaintiff would not be entitled to any type of relief, even if he proved the factual allegations in his complaint.  <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957); <u>Harsco Corp. v. Sequi</u>, 91 F.3d 337, 341 (2d Cir. 1996).  The court must assume the truth of the factual allegations in the complaint, <u>Harsco</u>, 91 F.3d at 341, and draw all reasonable inferences in the plaintiff's favor.  <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974). A court may also consider the contents of any documents attached to the complaint, incorporated by reference, or relied on in drafting the complaint, <u>Chambers v. Time Warner, Inc.</u>, 282 F.3d 147, 153 (2d Cir. 2002), as well as matters of which judicial notice may be taken.  <u>Brass v. American Film Techs., Inc.</u>, 987 F.2d 142, 150 (2d Cir. 1993).


Slightly different rules govern the motion to dismiss under FED. R. CIV. P. 12(b)(1).  A court must accept the material factual allegations in the complaint as true, but need not draw

11

inferences favorable to the plaintiff.   J.S. v. Attica Cent.
Schools, 386 F.3d 107, 110 (2d Cir. 2004), cert. denied, 125 S.
Ct. 1727 (2005); Shipping Fin. Servs. Corp. v. Drakos, 140 F.3d
129, 131 (2d Cir. 1998).   A court may also consider materials
outside of the pleadings to resolve any jurisdictional disputes,
but cannot rely on conclusory or hearsay evidence.   J.S., 386
F.3d at 110; Zappia Middle East Constr. Co. v. Emirate of Abu
Dhabi, 215 F.3d 247, 253 (2d Cir. 2000). Finally, the party
asserting the court's subject matter jurisdiction has the burden
of proving it by a preponderance of the evidence.   Luckett v.
Bure, 290 F.3d 493, 497 (2d Cir. 2002).


   Here, the Court has credited the pleadings, and also
considered the Plan and the aforementioned orders relating to the
Townhouse Property.   These extrinsic documents were mentioned in
and relied upon in drafting the Complaint, and may be considered
under either the Rule 12(b)(1) or the Rule 12(b)(6) standards.
While the Complaint does not include allegations relating to the
consummation of the Plan or the status of the distributions to
the creditors, no disputes exist.   Accordingly, the Court has
also taken these undisputed facts into account, since they bear
on the jurisdictional determination.

12

## B.    Bankruptcy Court Jurisdiction

Consideration of the bankruptcy court's subject matter jurisdiction begins with 28 U.S.C. § 1334.  Subsection (a) grants the district court exclusive jurisdiction over bankruptcy cases. Subsection (b) grants the district court "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."  The district court may refer its bankruptcy jurisdiction to the bankruptcy court.  28 U.S.C. § 157(a).  The United States District Court for the Southern District of New York referred its bankruptcy jurisdiction by General Order, signed July 10, 1984.

Proceedings that arise under title 11, or arise in a case under title 11 correspond to the Court's "core" jurisdiction. See 28 U.S.C. § 157(b)(1)("Bankruptcy judges may hear and determine . . . all core proceedings arising under title 11, or arising in a case under title 11. . . ."); Wood v. Wood (In re Wood), 825 F.2d 90, 96 (5th Cir. 1987)("[S]ection 157 apparently equates core proceedings with the categories of 'arising under' and 'arising in' proceedings.")  Generally, a core proceeding is one that invokes a substantive right under title 11, or could only arise in the context of a bankruptcy case.  Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.), 372 F.3d 154, 162-63 (3rd Cir. 2004); Wood, 825 F.2d at 97; Liberty Mut. Ins.

13

<u>Co. v. Lone Star Indus., Inc.</u>, 313 B.R. 9, 16 (D. Conn. 2004).
If the proceeding is core, the bankruptcy court can hear and
determine it.  28 U.S.C. § 157(b)(1).

A proceeding is "related to" a case under title 11 if the
outcome might have a "conceivable effect" on the estate.
<u>Publicker Indus., Inc. v. United States (In re Cuyahoga Equip.
Corp.)</u>, 980 F.2d 110, 114 (2d Cir. 1992); <u>see</u> <u>U.S. Brass Corp. v.
Travelers Ins. Group, Inc. (In re U.S. Brass Corp.</u>), 301 F.3d
296, 304 (5th Cir. 2002); <u>Pacor, Inc. v. Higgins (In re Pacor,
Inc.)</u>, 743 F.2d 984, 994 (3d Cir. 1984); <u>Celotex Corp. v.
Edwards</u>, 514 U.S. 300, 308 (1995)("related to" jurisdiction
includes causes of action owned by the debtor that become
property of the estate under 11 U.S.C. § 541 and suits between
third parties which have an effect on the bankruptcy estate).
"Related to" proceedings correspond to the Court's non-core
jurisdiction.  <u>Resorts Int'l</u>, 372 F.3d at 162; <u>see</u> <u>Wood</u>, 825 F.2d
at 97.  If the proceeding is non-core, the bankruptcy court may
still hear it, but can only render proposed findings of fact and
conclusions of law to the district court.  The district court
must render a final judgment after considering the proposed
findings and conclusions and reviewing <u>de novo</u> any matters that
are the subject of a timely objection.  28 U.S.C. § 157(c)(1).

14

## C.   Post-Confirmation Jurisdiction

Section 1334 does not expressly limit the bankruptcy court's jurisdiction following plan confirmation.  U.S. Brass Corp., 301 F.3d at 304.  Nevertheless, all courts that have addressed the question have ruled that once confirmation occurs, the bankruptcy court's jurisdiction shrinks.  Over sixty years ago, Second Circuit Judge Clark wrote:

> We have had occasion before to deplore the
> tendency of District Courts to keep reorganized
> concerns in tutelage indefinitely by orders purporting
> to retain jurisdiction for a variety of purposes,
> extending from complete supervision of the new business
> to modifications of detail in the reorganization.
> [Citations omitted.] Since the purpose of
> reorganization clearly is to rehabilitate the business
> and start it off on a new and to-be-hoped-for more
> successful career, it should be the objective of courts
> to cast off as quickly as possible all leading strings
> which may limit and hamper its activities and throw
> doubt upon its responsibility.

North Am. Car Corp. v. Peerless Weighing & Vending Mach. Corp., 143 F.2d 938, 940 (2d Cir. 1944).


The passing years and revised bankruptcy laws have not tempered Judge Clark's admonition.  More recently, Judge Easterbrook echoed the limits on post-bankruptcy jurisdiction:

> Once the bankruptcy court confirms a plan of
> reorganization, the debtor may go about its business
> without further supervision or approval.  The firm also
> is without the protection of the bankruptcy court.  It
> may not come running to the bankruptcy judge every time
> something unpleasant happens.

Pettibone Corp. v. Easley, 935 F.2d 120, 122 (7th Cir. 1991).

15

Consequently, a party invoking the bankruptcy court's post-confirmation jurisdiction must satisfy two requirements. First, the matter must have a "close nexus to the bankruptcy plan or proceeding, as when a matter affects the interpretation, implementation, consummation, execution, or administration of the confirmed plan or incorporated litigation trust agreement." Resorts Int'l, 372 F.3d at 168-69; accord Montana v. Goldin (In re Pegasus Gold Corp.), 394 F.3d 1189, 1194 (9th Cir. 2005)(adopting Resorts Int'l test); Bank of Louisiana v Craig's Stores of Texas, Inc. (In re Craig's Stores of Texas, Inc.), 266 F.3d 388, 390 (5th Cir. 2001)(post-confirmation jurisdiction limited to "matters pertaining to the implementation or execution of the plan"); Goodman v. Phillip R. Curtis Enters., Inc., 809 F.2d 228, 232 (4th Cir. 1987)(bankruptcy court's post-confirmation authority limited "to matters concerning the implementation or execution of a confirmed plan")(citing 11 U.S.C. § 1142(b)); Rahl v. Bande, 316 B.R. 127, 133 (S.D.N.Y. 2004)(post-confirmation jurisdiction extends to matters that involve the interpretation or implementation of the plan).[7] Second, the plan must provide for the retention of jurisdiction

---

[7]      In Boston Regional Med. Ctr. v. Reynolds (In re Boston Regional Med. Ctr.), 410 F.3d 100 (1st Cir. 2005), the Court ruled that post-confirmation jurisdiction in a liquidating chapter 11 case is greater because the debtor is winding up, there is no prospect of endless bankruptcy jurisdiction and "[a]ny litigation involving such a debtor thus relates much more directly to a proceeding under title 11." Id. at 106-07. The General Media plan was not a liquidating plan, and the reorganized debtors have continued their businesses.

16

over the dispute.    Hosp. and Univ. Prop. Damage Claimants v.
Johns Manville Corp. (In re Johns-Manville Corp.), 7 F.3d 32, 34
(2d Cir. 1993).[8]


It should also be noted that the distinction between core
and non-core jurisdiction may not be particularly relevant after
confirmation.  Although the cases generally focus on "related to"
post-confirmation jurisdiction, the scope of the post-
confirmation jurisdiction mapped out by the case law usually
meets the definition of a core proceeding.  Broadly speaking, the

---

[8]    The plaintiff reads Johns-Manville to limit the jurisdictional inquiry to the contents of the plan without regard to statutory law.  In Johns-Manville, the plan contained provisions retaining jurisdiction over a variety of proceedings but specifically excluded objections to a certain class of property damage claims.  7 F.3d at 33.  After confirmation, the reorganized debtor filed an objection to claims in the excluded class.  Id. at 34.  Observing that "the bankruptcy court's post-confirmation jurisdiction . . . is defined by reference to the Plan," id. at 34, the Court ruled that the bankruptcy court lacked jurisdiction over the claims objection.  Id. at 35.

The Court did not discuss the bankruptcy court's jurisdiction under 28 U.S.C. § 1334, presumably because the plan provisions made it unnecessary.  But the federal courts are courts of limited jurisdiction, and "neither the bankruptcy court nor the parties can write their own jurisdictional ticket."  Resorts Int'l, 372 F.3d at 161; accord Poplar Run Five Ltd. P'ship v. Virginia Elec. & Power Co. (In re Poplar Run Five Ltd. P'ship), 192 B.R. 848, 859 (Bankr. E.D. Va. 1995) (a plan provision cannot grant jurisdiction over a proceeding beyond the jurisdiction granted by statute); Grimes v. Graue (In re Haws), 158 B.R. 965, 969 (Bankr. S.D. Tex. 1993) ("Regardless of how that plan provision may read, a reservation of jurisdiction beyond what Congress has given or what is necessary to effectuate the debtor's reorganization exceeds the power of the bankruptcy court."); 8 ALAN N. RESNICK & HENRY J. SOMMER, COLLIER ON BANKRUPTCY ¶ 1142.04[1], at 1142-7 (15th ed. rev. 2005) (the plan does not confer jurisdiction; confirmation does not change the basic jurisdictional analysis).

17

proceeding must affect some aspect of the plan – its meaning, its implementation or its consummation – to come within the Court's post-confirmation jurisdiction.  By definition, plan-related matters arise only in the context of a chapter 11 bankruptcy case.  See TJN, Inc. v. Superior Container Corp. (In re TJN, Inc.), 207 B.R. 502, 508-09 (Bankr. D.S.C. 1996)(post-confirmation state law-based litigation arising in connection with pre-confirmation sale and affecting implementation of plan was core).  But even if the proceeding is core, its outcome must still affect the Plan.

In addition, and unless the plan says something different, confirmation vests the property of the estate in the reorganized debtor.  11 U.S.C. § 1141(b).  The estate comes to an end, and ceases to exist.  Craig's Stores, 266 F.3d at 390; Fairfield Communities., Inc. v. Daleske (In re Fairfield Communities., Inc.), 142 F.3d 1093, 1995 (8th Cir. 1998); Rickel & Assocs., Inc. v. Smith (In re Rickel & Assocs., Inc.), 272 B.R. 74, 97-98 (Bankr. S.D.N.Y. 2002).  Accordingly, the outcome of a post-confirmation proceeding cannot affect the estate.  Resorts Int'l, 372 F.3d at 165.

D.    **Jurisdiction and the Complaint**

Here, the plaintiff's lawsuit lacks a "close nexus" to the
Plan, and the claims fall outside of the Court's limited post-
confirmation jurisdiction.  None of the claims arise under the
Plan or require the Court to interpret it.  In addition, the
property of the various estates vested in the respective
reorganized debtors on the Effective Date, (Plan, § 9.1 (1)), and
the estate ceased to exist.  Thus, any recovery will inure solely
to the benefit of the plaintiff.

None of the proceeds, in this regard, will be paid by the
plaintiff to the unsecured creditors.  The unsecured class, Class
3A, received cash and notes under the Plan.  (Id., § 4.3.1(ii).)
The notes paid interest only until maturity, matured in seven
years, but could be prepaid without penalty.  (See id., § 5.2.)
Counsel for the plaintiff advised us at oral argument that the
debt evidenced by the notes has been refinanced.  The unsecured
creditors have presumably been paid from the proceeds of the new
loan and will receive nothing further.  Bankruptcy courts plainly
lack subject matter jurisdiction over post-confirmation
litigation where the case has been fully administered and all of
the recovery will go to the reorganized debtor rather than to the
creditors.  See, e.g., Poplar Run Five Ltd. P'ship, 192 B.R. at
858; Venn v. Kinjite Motors, Inc. (In re WMR Enters., Inc.), 163

19

B.R. 887, 890 (Bankr. N.D. Fla. 1994).

Even if the notes remain unpaid, and a successful outcome to this litigation would make it easier to pay them, the Court nonetheless lacks subject matter jurisdiction. Plans frequently call for future payments to creditors funded through future operations. A bankruptcy court cannot hear a post-confirmation dispute simply because it might conceivably increase the recovery to creditors, because the rationale could "endlessly stretch a bankruptcy court's jurisdiction." Pegasus Gold Corp., 394 F.3d at 1194 n.1; accord Craig's Stores, 266 F.3d at 391 ("[W]hile [the debtor] insists that the status of its contract with the Bank will affect its distribution to creditors under the plan, the same could be said of any other post-confirmation contractual relations in which [the debtor] is engaged.").

In addition, and to the extent it matters, all of the claims arise under state law, and are typically non-core. The Fourth and Fifth Causes of Action seek damages based upon common law claims sounding in conversion and breach of fiduciary duty. While some the improper NTS offsets, which began pre-petition, continued after the commencement of the case, the timing did not convert them into core proceedings. See, e.g., WMR, Enters., Inc., 163 B.R. at 889. These causes of action do not invoke

20

rights under title 11.  Nor are they the type that could only

arise in a bankruptcy case, a fact made plain by the pre-petition

onset of the claim.


The three turnover claims, asserted under 11 U.S.C. §

542(a), are also non-core.  Section 542(a) states:

> Except as provided in subsection (c) or (d) of
> this section, an entity, other than a custodian, in
> possession, custody, or control, during the case, of
> property that the trustee may use, sell, or lease under
> section 363 of this title, or that the debtor may
> exempt under section 522 of this title, shall deliver
> to the trustee, and account for, such property or the
> value of such property, unless such property is of
> inconsequential value or benefit to the estate.

Initially, § 542(a) is inapplicable on its face.  Once

confirmation occurs, there is no longer a trustee (_i.e._, the

debtor in possession) to whom property can be delivered, or an

estate that can benefit.  Furthermore, § 363 does not apply to a

reorganized debtor.  Consequently, a turnover proceeding under §

542 will not lie following confirmation.  In re Rickel & Assocs.,

272 B.R. at 97-98; In re Poplar Run, 192 B.R. at 856; In re WMR

Enters., 163 B.R. at 889.


In any event, the plaintiff's invocation of § 542(a) of the

Bankruptcy Code does not transform the nature of the claims.  See

Hassett v. BancOhio Nat'l Bank (In re CIS Corp.), 172 B.R. 748,

756 (S.D.N.Y. 1994)("In making my [core/non-core] determination,
I will look beyond the labels to the substance of the action in
order to discover whether it can be fairly said to arise under
the bankruptcy code and falls within the bankruptcy court's core
jurisdiction."). Section 542(a) does not apply if title is
disputed. Hirsch v. London S.S. Owners' Mut. Life Ins. Ass'n
Ltd. (In re Seatrain Lines, Inc.), 198 B.R. 45, 50 n. 7 (S.D.N.Y.
1996) ("It is settled law that the debtor cannot use the turnover
provisions to liquidate contract disputes or otherwise demand
assets whose title is in dispute.") (Sotomayor, J.) (quoting
United States v. Inslaw, Inc., 932 F.2d 1467, 1472 (D.C. Cir.
1991), cert. denied, 502 U.S. 1048 (1992)); cf. CIS Corp., 172
B.R. at 760 (the language of § 542(b) creates "a strong textual
inference that an action should be regarded as a turnover only
when there is no legitimate dispute over what is owed to the
debtor"). If an ownership dispute must be resolved before any
relief can be ordered, the proceeding is a non-core replevin
action under state law rather than a § 542(a) turnover
proceeding. See CIS Corp., 172 B.R. at 756.


     The questionable nature of the plaintiff's title to the
three assets at issue forecloses the use of § 542(a). In each
case, Guccione refused, despite demand, to deliver the property
to the plaintiff. This implies that he disputes the plaintiff's

22

title, and the plaintiff has not come forward with any contrary proof.

Furthermore, the allegations relating to the Townhouse Property and Domain Name highlight the disputed nature of the plaintiff's rights. The very subject of the January 15 Stipulation was the disputed title to the "Unresolved Property" located at the Townhouse. In addition, General Media may have abandoned any rights in "Removable Personal Property" still located at the Townhouse and the subject of this proceeding.

The Complaint ignores the January 15 Stipulation. Each item of "Unresolved Property" listed in the January 15 Stipulation also appears (along with other property) on Schedule A to the Complaint, the list of "Townhouse Property" that is the subject of plaintiff's first turnover claim. Yet the plaintiff failed to join the Owner as a defendant on the Townhouse Property claim. This omission underscores the conclusion that the Townhouse Property turnover claim does not seek to enforce the Court's prior order, but rather, to circumvent it.

The allegations involving the Domain Name admit that the plaintiff does not have legal title to or possession of the

23

Domain Name.  According to the Complaint, Penthouse Australia
Pty., Ltd., an Australian entity affiliated with Guccione, owns
the Domain Name.  At most, the plaintiff holds equitable title,
(Complaint, ¶ 79), based on its use of the Domain Name, the
reasons for its creation and the payment of all of the related
expenses.  The plaintiff did not join Penthouse Australia Pty.,
Ltd. as a defendant on this claim, even though the Complaint
acknowledges its legal title.


     Finally, the turnover claim relating to the Trademark
Property is the most jurisdictionally far-fetched.  The Trademark
Property was never property of General Media or the General Media
estate.  Instead, the plaintiff acquired its rights, by
assignment, approximately a year after confirmation and just
three weeks before the commencement of this lawsuit.  The
plaintiff took the assignment as part of its ongoing business,
and the transaction is totally divorced from the case, the estate
and the Plan.  Lastly, the Complaint does not name PPL, the owner
of the UK Trademarks, as a defendant despite the fact that the
plaintiff seeks recovery, in the alternative, of the UK
Trademarks or the PPL stock.


     In conclusion, the Court lacks subject matter jurisdiction

24

over this adversary proceeding, and grants Guccione's motion to dismiss under FED. R. CIV. P. 12(b)(1).  In light of this disposition, I do not reach the other arguments offered in support of the motion.  The plaintiff is directed to settle a final order dismissing the Complaint

So ordered.

Dated:     New York, New York
           December 27, 2005

                        /s/  *Stuart M. Bernstein*
                             STUART M. BERNSTEIN
                    Chief United States Bankruptcy Judge